## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| NATURAL PRODUCTS ASSOCIATION,<br>1773 T Street, NW<br>Washington, DC 20009, | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| CAROLYN BEHRMAN<br>1825 Central Ave<br>Columbus, IN 47201, | ) |
|  | ) |
|  | ) |
|  | ) |
| DONELSON CAFFERY<br>3062 Stony Point Rd<br>Richmond, VA 23235, | ) |
|  | ) |
|  | ) |
|  | ) |
| ROBERT CRAVEN<br>8 Bowers Road<br>Derry NH 03038, | ) |
|  | ) |
|  | ) |
|  | ) |
| CLAUDIA DAVID-ROSCOE<br>3904 Secor Rd<br>Toledo, OH 43623-4405, | ) Civil Action No. |
|  | ) |
|  | ) **COMPLAINT** |
|  | ) |
| STEPHEN DISTEFANO<br>396A Larkfield Road<br>East Northport, NY 11731, | ) |
|  | ) |
|  | ) |
|  | ) |
| FRANCES DRENNEN<br>2300 Mcfarland Blvd. E., Suite 12<br>Tuscaloosa, AL 35404, | ) |
|  | ) |
|  | ) |
|  | ) |
| BEN HENDERSON<br>273 Boone Heights, Dr.<br>Boone, NC 28607-4927, | ) |
|  | ) |
|  | ) |
|  | ) |
| ANGIE O'PRY-BLADES<br>1211 N. 18th St.<br>Monroe, LA 71201, | ) |
|  | ) |
|  | ) |
|  | ) |
| NICHOLAS PASCOE<br>125 E. Woodin Avenue<br>Chelan, WA 98816, | ) |
|  | ) |
|  | ) |

HOWARD POLLACK                                )
13208 Washington Blvd                         )
Los Angeles, CA 90066,                        )
                                              )
       Defendants.                            )
                                              )

1.       Plaintiff, Natural Products Association ("NPA"), for its Complaint against

Defendants Carolyn Behrman, Donelson Caffery, Robert Craven, Claudia David-Roscoe,

Stephen Distefano, Frances Drennen, Ben Henderson, Angie O'pry-Blades, Nicholas Pascoe and

Howard Pollack (collectively "Defendants") alleges as follows:

## NATURE OF THE ACTION

2.       This is a civil action against ten current or former members of NPA's Board of

Directors – self-described as NPA's "shadow board" – for breach of fiduciary duties, waste of

corporate assets, tortious interference with business relations and economic advantage, civil

conspiracy, and indemnification or contribution. NPA filed this case to protect the association in

the face of Defendants' wildly inappropriate and illegal behavior. Defendants colluded and

conspired with a disgruntled, now former, employee of NPA. By their bad faith actions, they

intended to harm and tried to undermine NPA and force the termination of its new

CEO/Executive Director, who was hired to reform and revitalize NPA. Defendants blatantly

breached the duties they owed to the association, all for their own personal benefit and to indulge

their personal whims. As a result, the Defendants who are currently Directors should be removed

from their position of trust and responsibility, enjoined from further improper and bad faith

conduct, and ordered to compensate NPA for its injuries.

2

## THE PARTIES

3.      Plaintiff NPA is an Illinois not-for-profit corporation with its principal place of business in Washington, DC.

4.      Defendant Carolyn Behrman ("Behrman") is a citizen of Indiana. She was and is a member of NPA's Board of Directors and its Executive Committee. She is affiliated with Natural Choices for Healthy Living, which is a retail member of NPA.

5.      Defendant Donelson Caffery ("Caffery") is a citizen of Virginia. He was and is a member of NPA's Board of Directors. He is affiliated with Good Foods Grocery, Inc., which is a retail member of NPA.

6.      Defendant Robert Craven ("Craven") is a citizen of New Hampshire. He was a member of NPA's Board of Directors until he resigned January 22, 2016. He is the CEO of FoodState, Inc., which is a subsidiary of Pharmavite LLC and which is a retail member of NPA.

7.      Defendant Claudia David-Roscoe ("David-Roscoe") is a citizen of Ohio. She was and is a member of NPA's Board of Directors. She is affiliated with Healthy Foods by Claudia, which is a retail member of NPA.

8.      Defendant Stephen Distefano ("Distefano") is a citizen of New York. He was and is a member of NPA's Board of Directors. He is affiliated with Strictly Gluten Free, which is a retail member of NPA.

9.      Defendant Frances Drennan ("Drennan") is a citizen of Alabama. She was and is a member of NPA's Board of Directors. She is affiliated with Manna Grocery & Deli, which is a retail member of NPA.

10.     Defendant Ben Henderson ("Henderson") is a citizen of North Carolina. He was a member of NPA's Board of Directors until he resigned on February 1, 2016. He was or is affiliated with Bare Essentials Natural Market, which is a retail member of NPA.

11.     Defendant Angie O'pry-Blades ("O'pry-Blades") is a citizen of Louisiana. She was a member of NPA's Board of Directors until her term expired on or about December 31, 2015. She is affiliated with Fiesta Nutrition Center, Inc., which is a retail member of NPA.

12.     Defendant Nicholas Pascoe ("Pascoe") is a citizen of Washington. He was a member of NPA's Board of Directors until his term expired on or about December 31, 2015. He is affiliated with Bear Foods Natural Market, which is a retail member of NPA.

13.     Defendant Howard Pollack ("Pollack") is a citizen of California. He was and is a member of NPA's Board of Directors. He is affiliated with Rainbow Acres, which is a retail member of NPA.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1332, 2201 and 2202. NPA and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over all Defendants. Defendants have continuous and systemic contacts with the District of Columbia and have been and are conducting and doing business in this District. Defendants are Directors of NPA, which has its principal place of business in the District of Columbia. Defendants have traveled to and participated in NPA business and events in the District of Columbia. Defendants have taken actions in the District of Columbia that form, at least in part, the bases for NPA's claims against them. Personal jurisdiction exists pursuant to D.C. Code § 13-423.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## BACKGROUND

**NPA Corporate Structure**

17.     Founded in 1936, NPA is the nation's largest and oldest nonprofit organization dedicated to the natural products industry. NPA represents over 1,400 members accounting for more than 10,000 retail, manufacturing, wholesale, and distribution locations of natural products, including foods, dietary supplements, and health/beauty aids. NPA has a diverse membership, from the smallest health food store to the largest dietary supplement manufacturer.

18.     Pursuant to its Bylaws, NPA has two categories of voting members – retailers and suppliers. Voting members are eligible for election or appointment to office, to vote on matters submitted to the members, to serve on committees, attend meetings and receive information. NPA's officers, elected by the voting members, include a President, President-Elect, Immediate Past President, Treasurer, Retail Council Chairperson and Supply Council Chairperson. The affairs of NPA are managed under the direction of a Board of Directors consisting of 20 voting members, 10 of which are retailers and 10 are suppliers. An Executive Committee of the Board is authorized to act upon such matters as may be referred to it during intervals between meetings of the Board of Directors. Pursuant to its Bylaws, NPA has chartered regional organizations to provide services to members on regional issues in accordance with the terms of the charters.

19.     The members of NPA's Board of Directors owe fiduciary duties to the organization.

20.     The Board of Directors may employ a CEO/Executive Director to manage and direct the activities of NPA subject to general supervision by the Board of Directors and the Executive Committee. Under NPA's Policies and Procedures, incorporated herein by reference,

5

the CEO/Executive Director manages and directs the headquarter's office and is responsible for implementing and enforcing NPA's policies. The CEO/Executive Director is the official spokesperson for NPA. Under § 13 of the Policies and Procedures, the Executive Committee has the authority to hire and terminate the CEO/Executive Director and establish the length and term of his or her contract, subject to ratification by the Board of Directors.

21.    Brent Weickert ("Weickert") was employed by NPA from about 1997 until he was terminated on October 15, 2015. During all relevant times, he was an at will employee who acted as NPA's Senior Vice President and Chief Financial Officer. He also performed some human resource duties. Even though NPA's offices were in Washington, he worked out of his house in California. At the time he was terminated in October 2015, NPA was paying Weickert $170,000 per year, used to support his taste for fine wine and expensive vacations, which Weickert readily discloses in true and correct copies of excerpts of his Twitter and Facebook postings. *See* Exhibits 1-2, incorporated herein by reference.

**NPA Hires Fabricant as CEO/Executive Director**

22.    In 2014, NPA was moribund and not particularly effective in representing its members. Membership in the association was stagnant. Its finances were bleak, there were divisions among the members, and NPA lacked the necessary scientific and natural products industry expertise and ability to represent its members on important policy and regulatory issues.

23.    In order to change the status quo and revitalize the association, NPA hired Daniel Fabricant, Ph.D. ("Fabricant") as its CEO/Executive Director in April 2014. Fabricant previously served as the Director of the Division of Dietary Supplement Programs at the U.S. Food and Drug Administration ("FDA"), where he directed agency policy, public affairs and regulatory action regarding regulation of the dietary supplement industry for more than three years.

6

3291356

Fabricant received more than 30 FDA awards for his enforcement initiatives on dietary supplements. Prior to serving at FDA, Fabricant was Vice President for global government and scientific affairs for NPA. He has a Ph.D. in Pharmacognosy from the University of Illinois at Chicago. He has also published extensively and is internationally recognized for his regulatory and governmental public health expertise and natural products research. In 2015, Fabricant's contract with NPA renewed.

24.     NPA also hired Corey Hilmas, MD, Ph.D. ("Hilmas"), as Senior Vice President of Scientific and Regulatory Affairs. Hilmas leads NPA in researching, developing, drafting and submitting official comments on proposed rulemakings with federal and state regulatory authorities. NPA now submits more official public comment than any other industry trade association. Hilmas also oversees educational and compliance programs, such as cGMP training, Natural Seal, TruLabel and others. Prior to NPA, he served as Chief of the Dietary Supplement Regulation Implementation Branch under the Division of Dietary Supplement Programs at the FDA, and also was Senior Toxicologist for Dietary Ingredients.

25.     NPA further hired Michael Kelley ("Kelley") as Director of Government Affairs. He coordinates NPA's federal and state government affairs efforts, which involves legislative strategy, managing relations with the U.S. Congress, and overseeing the industry's largest Political Action Committee (PAC). Kelley previously worked for two leading Members of Congress and later held government relations positions at Mayer Brown LLP and The Moffett Group.

26.     Fabricant identified four primary objectives for NPA:

(a)     Messaging, Media and Communications – Establish and strengthen an aggressive public relations campaign with media, influencers and others to demonstrate the

quality, safety and benefits of products manufactured and distributed by responsible members. Launch new research and data products that can be released to regulators, influencers and media to improve the narrative.

(b)     Technical Expertise, Education and Training – Work with members and regulatory officials in an ongoing informational exchange of best practices, new technologies and joint efforts to meet growing demand for high quality products.

(c)     Advocacy, Outreach and Grassroots – Conduct sophisticated advocacy campaign and ongoing dialogue with federal and state lawmakers, attorneys general, and regulatory officials.

(d)     Membership – Build NPA's membership to convince target audiences that NPA's members are reputable, follow best practices, and are committed to delivering the highest quality products to help improve public health and wellness.

27.     After Fabricant was hired, he began efforts to revitalize NPA and support its supplier and retailer members. NPA became much more active and involved in public policy and regulatory issues affecting its members. NPA's membership, financing, grassroots initiatives, and scientific and technical expertise have all grown under the leadership of Fabricant. For example, NPA has added more than 350 new members since April 2014. When PBS' Frontline program recently broadcast a report on "Supplements and Safety", it looked to NPA's Fabricant to speak for the industry. Additional facts regarding NPA's progress and reform since Fabricant was hired are summarized in news stories and NPA documents, true and correct copies of which are attached as Exhibit 3, incorporated herein by reference.

28.     Fabricant also took action to place NPA on a more secure financial footing. For example, in addition to growing revenue, NPA reduced expenses. As part of these reductions,

certain travel expenses for retail members of NPA's Board of Directors were no longer reimbursed. Further, Fabricant proposed changing NPA's dues structure. While supplier members paid tens of thousands of dollars in dues, retail members paid only $49. Some retail members of the Board of Directors, including Defendants, loudly opposed these changes, which would cause them to have to pay their own travel expenses and increased annual membership dues. Thus, they determined that Fabricant's changes would not be in their personal interest, while ignoring the interests of NPA.

29.     Weickert did not agree with NPA's decision to hire Fabricant, to whom he reported, and his reform agenda to strengthen the organization. Moreover, he knew that NPA could contract with an outside firm to perform Weickert's functions at half the annual cost.

30.     In fact, as early as February 11, 2015, Fabricant emailed Weickert regarding his deficient job performance that cost NPA a $25,000 contribution to its political action committee. Fabricant also notified Weickert that he should begin planning for a six to 12 month transition plan to leave NPA. *See* Exhibit 4, incorporated herein by reference. Weickert became concerned that his $170,000 annual salary from NPA was at risk.

**Defendants Collude and Conspire with Weickert and Injure NPA**

31.     In Spring 2015, Weickert and Defendants began communicating between and among themselves with the intent and purpose of sabotaging changes and reforms at the association and to force Fabricant out as its CEO/Executive Director. Weickert knew that if Fabricant's contract with NPA could be terminated, he would be in a position to keep his lucrative job or even become the new CEO/Executive Director. Weickert improperly used his position as a NPA employee to try to achieve that objective.

9

32.     For example, in May 2015, approximately three months after Fabricant indicated that Weickert's time at NPA would be coming to a close (Exhibit 4), Weickert sent a letter to NPA's President – largely based on hearsay, double hearsay or rumors, alleging that Fabricant had engaged in supposed prohibited, unethical or illegal behavior. He followed up with a second letter to NPA's President. As a result of those letters, NPA's outside counsel conducted and completed a comprehensive and privileged inquiry into the allegations. NPA's President subsequently informed Weickert that the matter was concluded.

33.     Weickert's letters to NPA's President did not disclose that Weickert wasted NPA's money and property. For example, he authorized an employee's use of NPA's corporate credit card to buy hundreds of dollars of clothing, for which there could be no business purpose. *See* Exhibit 5, incorporated herein by reference. Further, in May 2015, Weickert approved two expense checks payable to Connie Randolph ("Randolph"), supposedly to pay for costs of Randolph's relocation expenses. In fact, the actual reimbursement receipts included a round trip airplane ticket issued to Debra Ray, a relative or friend of Randolph, from Hawaii to Arizona and a car rental in Arizona of about $2,598. Weickert paid Randolph even though there was no NPA business purpose for those expenses, Weickert's letter to NPA's President also left out the fact that he misappropriated NPA's property by using award points on NPA's corporate credit card to buy an expensive telescope and camera for himself. Nor did Weickert disclose that, contrary to NPA's policies, Weickert rarely supplied receipts and unilaterally approved his own expense reimbursements. Weickert set up NPA's account with American Express as a small business account. He listed himself as the sole owner of the business. Not only was that false, it left Weickert in control of the account, such that he could control it and provide himself and his favored employees with personal benefits at NPA's expense. NPA engaged an accounting firm,

10

Tate & Tryon, to conduct a forensic audit. Its preliminary report, a true and correct copy of which is attached as Exhibit 6 and incorporated herein by reference, establishes numerous issues with Weickert's job performance. Weickert chose not to disclose any of these or other issues to NPA's officers, Board of Directors or Executive Committee.

34.    At least as early as July 2015, Weickert and Defendants began colluding and conspiring to remove Fabricant as CEO/Executive Director, to assist Weickert, to harass the officers, managers and staff of NPA, and to attempt to harm the long-term financial stability of NPA, all for their own personal benefit, in direct contravention of their fiduciary duties as Directors of the association. By way of example, Exhibit 7 is a portion of emails to and from Weickert and Defendants (with privileged communications and personnel information redacted) evidencing their improper and wrongful bad faith conduct.

35.    On July 20, 2015, Henderson told Weickert that "I concur with you that something has to be done" and that "removing Dan [Fabricant] has to be priority #1." Exhibit 7 at page 65.

36.    On July 25, 2015, Henderson and Caffery had telephone and emails communications regarding their intent to seek an executive session of NPA's Board "to discuss all past or current investigations of the job performance of Dr. Dan Fabricant." *Id*. at page 60-61.

37.    Defendants conspired and colluded with Weickert and acted in concert with each other and with him to commit improper and wrongful bad faith conduct detrimental to the NPA. The Defendants and Weickert conducted a one-sided "investigation" of Fabricant, which was not authorized by the Executive Committee or Board of NPA. By conducting such an investigation and trying to create evidence, the Defendants breached their duties to NPA and placed NPA in legal jeopardy. Weickert and Defendants engaged in the following improper activities:

3291356

(a)     Weickert provided Defendants with copies of NPA credit card statements;

(b)     Weickert provided Defendants with multiple confidential attorney-client communications with Sidley & Austin, NPA's outside counsel;

(c)     Defendants encouraged Weickert to obtain a letter from former employee, Connie Randolph, critical of Fabricant, in violation of an agreement with NPA;

(d)     Weickert compiled and provided Defendants with a spreadsheet regarding employee tenure and speculating on reasons for termination; and

(e)     Weickert prepared and provided Defendants with "thoughts" on reasons for an employee's departure and a summary of discussions with an intern critical of NPA.

Defendants further breached their duties to NPA by failing to notify the Executive Committee, other Board members or NPA's counsel about what Weickert was doing.

38.     Weickert also consulted with Defendants on strategic advice on policy issues to be considered by the Board, such as NPA's dues and budget, expenses, personnel issues, and attempts to remove Fabricant as CEO/Executive Director. From July through September 2015, Weickert sent Defendants information and documents outside the normal channels of communication. The highly irregular nature of the communications is shown by the fact that Weickert used his personal email, bweickert@sbcglobal.net, to communicate with Defendants. *See* Exhibit 7 Further, an August 19, 2015, email to Henderson from Weickert's personal account was signed "James Bond", *Id*. at page 49. On August 26, 2015, Weickert sent a copy of a letter he solicited from former employee Randolph. Weickert signed his transmittal email "BW (007)." *Id*. at page 37. Henderson responded: "Good letter! Thanks for sharing, '007. The evidence is mounting." *Id*. These and other communications reflect Weickert's and Defendants' conscious

knowledge that they were acting secretly and improperly. Defendants breached their duties to NPA by not disclosing to the full Board of Directors or Executive Committee what Weickert was doing or their own role in supporting it.

39.     On July 29, 2015, Defendants communicated with each other by email regarding holding an executive session of the Board, sharing confidential documents received from Weickert and a letter that had been reviewed by a non-NPA "attorney friend" of Henderson. Henderson emphasized the "element of surprise" in calling for such a session. By concocting a scheme to "surprise" the other members of the Board of Directors, Defendants did not act in good faith.

40.     Defendants consulted and obtained assistance and support from Weickert in executing their secret plan.

41.     On August 18, 2015, Fabricant emailed Weickert regarding his deficient job performance, specifically noting that he had become aware of his communications with Board members without his knowledge and instructed Weickert that "if there is any contact with the board or [Executive Committee] you are to advise me of the nature of such contact." *See* Exhibit 8, incorporated herein by reference. Weickert ignored the instruction and continued his improper conduct.

42.     On August 28, 2015, Weickert wrote to Randolph and another former employee expressly seeking negative statements about Fabricant on behalf of "several board members." Exhibit 7 at page 33.

43.     Defendants implemented their long-planned surprise attack on NPA and Fabricant at the September 14, 2015, regular meeting of the Board of Directors. They demanded that the Board meet in executive session, during which they tried – and failed – to remove Fabricant as

13

CEO/Executive Director based on Weickert's already-investigated allegations. It was clear from the discussion that a majority of the Executive Committee – which is the NPA entity responsible for such decisions, subject to Board ratification – would not support Fabricant's termination.

44.     Defendants also colluded and acted in concert before and at the September 14 Board meeting to ensure that NPA tabled and failed to pass a budget at the September 14 meeting.

45.     On October 14, 2015, Henderson wrote to his co-Defendants and others that: "I think there is a consensus among this group (I've dubbed us the 'shadow board'!) that Dan is just not the right person for this job." Exhibit 7 at page 2. Behrman responded "Hear! Hear!" She further said "people think no one but [Fabricant] could have taken us this far. Perhaps that's true, but it is hard to believe there isn't someone out there equally as good and less abrasive." *Id.* at page 1. Defendants agreed to continue to try to force out Fabricant as CEO/Executive Director despite the progress that NPA had made and their knowledge that a majority of the Executive Committee would not vote to oust Fabricant.

46.     On October 15, 2015, NPA terminated Weickert from his at will employment. He was terminated for at least the following reasons:

(a)     Because Defendants prevented passage of a budget at the September 14 Board meeting that would have resulted in increased revenue, NPA needed to further reduce expenses. Weickert was paid base compensation of about $170,000 per year. NPA is a relatively small trade association and has been exploring ways to reduce its costs to meet a budget shortfall. NPA's Executive Committee determined that it would be much cheaper for NPA to outsource the functions Weickert performed as a full time employee. NPA has implemented the cost

14

saving outsourcing. The Executive Committee was also concerned that NPA and its staff is located in Washington, D.C. and Weickert worked out of his home in California, which was not necessarily efficient or prudent from a control and reporting standpoint.

(b)     Prior to his termination, NPA learned that Weickert engaged in financial improprieties while an employee of NPA. He used NPA credit card reward points for his personal benefit, including the purchase of an expensive telescope and a camera. On October 15, 2015, he admitted he did so without authorization. NPA determined that it could not continue to employ a person as chief financial officer who abused his position for improper personal benefit.

(c)     Prior to his termination, there were issues with Weickert's performance of his job responsibilities. By way of example, communications with NPA's auditors revealed that he was unable to account for a significant variance in the general ledger. In addition, Weickert had poor relationships with other NPA employees.

(d)     Prior to his termination, Weickert communicated internal NPA data and information to certain members of the Board of Directors (*i.e.*, to Defendants) outside the normal reporting channels and beyond the scope of his authority. NPA determined that it could not continue to employ a person who acted outside the scope of his authority. Evidence uncovered after his termination, including Weickert's emails sent and stored on an NPA computer and communications with Defendants, corroborate the fact that he acted improperly. *See also* Exhibit 6.

47.     On or about October 26, 2015, faced with the prospect of a claim from Weickert, NPA notified certain Board members, including Defendants, that it was conducting an internal

inquiry into, among other things, their communications with Weickert and their compliance with their fiduciary duties. NPA asked for their cooperation, requested that responsive documents be produced no later than November 2, 2015. NPA also asked the Defendants to advise NPA by October 29, 2015, if they would cooperate by producing documents. NPA also asked to schedule interviews with Defendants and asked for available dates during the week of November 2, 2015. NPA subsequently asked Defendants to disclose whether or not they revealed any privileged communications to Weickert. None of the Defendants fully cooperated with NPA, which itself is a breach of duty.

48.      On December 7, 2015 Weickert sued NPA and Fabricant in the Superior Court of San Luis Obispo County, California ("Weickert Litigation"). On December 23, NPA and Fabricant timely removed the case to U.S. District Court for the Central District of California. On January 28, 2016, the Central District transferred the case to this Court, where it is now pending as No. 1:16-cv-00142-RJL ("Weickert Litigation").

49.      The complaint in the Weickert Litigation alleges nine causes of action against NPA or Fabricant personally. These are: (1) wrongful termination in violation of public policy against NPA; (2) retaliation in violation of the Fair Employment and Housing Act ("FEHA") (Cal. Gov't Code § 12940, *et seq*.) against NPA; (3) religious and sexual harassment/hostile work environment in violation of FEHA against NPA and Fabricant; (4) failure to prevent discrimination, harassment and retaliation in violation of FEHA against NPA; (5) negligent hiring and retention of Fabricant by NPA; (6) violation of Cal. Labor Code § 1102.5 against NPA; (7) intentional infliction of emotional distress against NPA and Fabricant; (8) failure to pay vested vacation time upon termination against NPA; and (9) waiting time penalties against NPA. A motion to dismiss for failure to state a claim and to strike certain allegations is pending.

16

50.     Less than a month after he was fired, on or about November 12, 2015, Weickert obtained a new job as Director of Finance of the Paso Robles Housing Authority. Further, while claiming he suffered emotional distress, Weickert continues to enjoy fine wine and vacations. *See* Exhibits 1-2.

51.     At the December 15, 2015 NPA Board meeting held in Washington, DC, Defendants continued their effort to have NPA terminate Fabricant. However, NPA's President invoked § 13 of NPA's Policies and Procedures, which provides that only the Executive Committee has the authority to hire and terminate NPA's CEO, subject to ratification by the Board of Directors, and ruled that such a motion would be improper for the Board to make and consider. Thus, the issue of Fabricant's continued employment at NPA has been conclusively resolved.

52.     As alleged above, after Weickert was terminated, NPA began an inquiry into his conduct and his communication with certain select members of the Board of Directors. NPA asked Defendants, among others, to provide relevant documents and information in their possession, custody or control. Defendants did not fully and/or timely cooperate with the inquiry and thus breached their fiduciary duties to NPA. Indeed, Defendant Pascoe told the Board of Directors on December 15, 2015 meeting that he would not cooperate with the inquiry.

53.     As a result of the foregoing, NPA has been injured. It has lost potential members and business opportunities that would strengthen the position of the association. It has also been forced to incur unnecessary costs and expenses, including attorneys' fees, accountants' fees, expenses and costs. Defendants failure to consider and adopt a budget in September 2014, has also resulted in lost or lower membership dues. Defendants harassing and vexatious conduct has also diverted the attention of NPA and its staff from carrying out its corporate purposes.

54.     An immediate, real and justiciable controversy exists between the parties to this action.

55.     The conduct of Defendants was willful, malicious and intended to benefit them personally at the expense of NPA.

## COUNT I
### (Breach of Fiduciary Duties)

56.     The foregoing allegations of this complaint are incorporated by reference.

57.     The Illinois Not for Profit Corporation Act provides that "[d]irectors and officers are subject to common law and other statutory duties and responsibilities." 805 ILCS § 105/108.85. A fiduciary relationship exists where there is special confidence in one who, in equity and good conscience, is bound to act in good faith with due regard to the interests of the other. The fiduciary duties owed by directors of a Illinois corporation are the duties of due care, loyalty and good faith.

58.     The fiduciary duty of due care requires that directors use that amount of care that ordinarily careful and prudent men would use in similar circumstances and consider all material information reasonably available" in making business decisions.

59.     The fiduciary duty of loyalty requires directors not to use their position of trust and confidence to further their private interests. A director must affirmatively act to protect the interests of the corporation. She also may not do anything that would injure the organization, deprive it of an advantage, or to enable it to engage in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest. The duty of loyalty mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director and not shared by the members generally. The classic example that implicates the duty

3291356

of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all members.

60. To act in good faith, a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation. A director may not act for some purpose other than a genuine attempt to advance the organization's welfare or when it would be a knowing violation of applicable law. In other words, an action taken with the intent to harm the organization is a disloyal act in bad faith.

61. Defendants' improper and wrongful conduct and communications alleged above constitute bad faith breaches of their duties of due care, loyalty and good faith they owed to NPA as Directors of NPA.

62. Under the Illinois Not for Profit Corporation Act, a court may remove a director from office in a proceeding commenced by the corporation if the court finds (1) the director is engaged in fraudulent or dishonest conduct or has grossly abused his or her position to the detriment of the corporation, and (2) removal is in the best interest of the corporation. 805 ILCS § 105/108.35(d). Defendants have engaged in fraudulent and dishonest conduct and have grossly abused their position as Directors to the detriment of NPA. Their immediate removal as Directors is in the best interests of NPA. As a direct and proximate result of the foregoing, Defendants should be order removed as members of NPA's Board of Directors.

63. In addition, Defendants improper and wrongful conduct as alleged above is continuing and ongoing and, unless enjoined, they are continuing to breach their fiduciary duties to NPA. Defendants should be preliminarily and permanently enjoined from breaching their fiduciary duties. NPA will be irreparably harmed unless an injunction is entered. The balance of hardships is in favor of NPA and an injunction is in the public interest.

3291356

64.     As a direct and proximate result of the foregoing, Defendants' breaches of their fiduciary duties have damaged and injured NPA in an amount to be determined at trial in excess of $75,000.

## COUNT II
### (Waste of Corporate Assets)

65.     The foregoing allegations of this complaint are incorporated by reference.

66.     Defendants' acts and omissions constitute waste of the corporate assets of NPA.

67.     As a direct and proximate result of the foregoing, NPA has sustained financial losses and other damages in an amount to be determined at trial in excess of $75,000.

## COUNT III
### (Tortious Interference with Business Relations and Economic Advantage)

68.     The foregoing allegations of this complaint are incorporated by reference.

69.     At all relevant times, NPA had a valid business relationship or expectancy with members, potential members and the natural products industry.

70.     Defendants knowingly and intentionally interfered with such relationships.

71.     As a direct and proximate result of Defendants' wrongful conduct, NPA has been injured by Defendants in an amount to be proven at trial in excess of $75,000.

72.     Further, Defendants' tortious interference was made with the intent to vex, injure and harm NPA so as to constitute oppression and malice justifying an award if exemplary and punitive damages in an amount to be determined at trial.

## COUNT IV
### (Civil Conspiracy)

73.     The foregoing allegations of this complaint are incorporated by reference.

3291356

74.     Defendants and Weickert combined and conspired for an unlawful purpose, i.e., to breach fiduciary duties, disparagement and tortious interference with economic advantage with the intent to injure NPA and Fabricant.

75.     Defendants have done one or more overt acts in furtherance of their conspiracy.

76.     As a direct and proximate result of the civil conspiracy, NPA has been injured by Defendants in an amount to be proven at trial in excess of $75,000.

## COUNT IV
### (Declaratory Judgment – Indemnification/Contribution)

77.     The foregoing allegations of this complaint are incorporated by reference.

78.     Defendants owed fiduciary duties to NPA and they breached those duties. As a result of Defendants' improper and wrongful conduct, including their expressly encouraging and requesting Weickert to gather information to be used against NPA and Fabricant, NPA was sued in the Weickert Litigation and has incurred and will continue to incur defense fees, expenses, costs and potential liability.

79.     NPA is entitled to a judgment declaring that Defendants must provide common law or equitable indemnification or contribution to NPA for such defense fees, expenses, costs and potential liability.

## REQUEST FOR RELIEF

NPA respectfully requests the following relief:

a.     judgment in NPA's favor and against Defendants;

b.     order removing Defendants as members of the Board of Directors of NPA;

c.     judgment granting preliminary and permanent injunctions enjoining Defendants and those persons in active concert with any of them, from breaching their fiduciary duties to NPA;

21

d.    judgment awarding compensatory damages to NPA in an amount to be determined at trial in excess of $75,000;

e.    judgment granting punitive and exemplary damages in the maximum amount allowed by law;

f.    judgment declaring that NPA is entitled to be indemnified for any damages, costs and expenses incurred in connection with the Weickert Litigation;

g.    an award of reasonable attorneys' fees and expenses in this action as allowed by law;

h.    an award of costs; and

i.    such other relief as the Court deems just and proper under the circumstances.

Dated: February 4, 2016                    Respectfully submitted,

                                           /s/ Richard J. Oparil
                                           Richard J. Oparil
                                           (D.C. Bar No. 409723)
                                           PORZIO, BROMBERG & NEWMAN P.C.
                                           1200 New Hampshire Ave., NW, Suite 710
                                           Washington, DC 20036-6802
                                           (202) 517-1888
                                           (202) 517- 6322 (fax)
                                           rjoparil@pbnlaw.com

3291356